# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-2881
_____

Deborah A. Tobacco

*Plaintiff - Appellant*

v.

Avera McKennan, doing business as Avera Research Institute

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: May 12, 2026
Filed: August 10, 2026
_____

Before L.R. SMITH, BENTON, and STRAS, Circuit Judges.
_____

BENTON, Circuit Judge.

Deborah A. Tobacco sued her former employer, Avera McKennan (Avera), doing business as Avera Research Institute (ARI), for race discrimination. The district court[1] granted summary judgment to Avera, finding Tobacco failed to

---

[1]The Honorable Camela C. Theeler, United States District Judge for the District of South Dakota.

establish a prima facie case of race discrimination, and that she failed to show ARI's reduction in force was a pretext for discrimination. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

ARI, a research institute within Avera, conducts health studies for underserved populations, particularly Native Americans. ARI had offices in Sioux Falls, Rapid City, and Pine Ridge, South Dakota.

In 2017, Dr. Amy Elliott, ARI's Chief Clinical Research Officer, recruited Tobacco, a Native American, as a Clinical Research Manager. She worked primarily in the Pine Ridge office. Tobacco supervised one full-time Research Assistant, Paul Forney, also Native American. According to Tobacco, ARI considered her race in hiring her, "because of its perceptions that her race would make her qualified to connect with Native American research study participants, and for the appearance of including a Native American person on its management team."

ARI—largely grant-funded—paid almost all its employees' wages with grant funds. Any internal (non-grant) money paid only those in ARI's leadership. Most of Tobacco's salary was funded with internal money. The salaries of the two other managers (at Rapid City and Sioux Falls) were paid primarily from grant funds. ARI attributed this difference to fewer grants awarded to the Pine Ridge office.

In 2020, Tobacco and Forney were assigned to a specific study, Dr. Arielle Deutsch's Systems of Native Community Health (SYNCH). For this study, ARI had to "recruit specific numbers of participants" from Pine Ridge and Rapid City. Tobacco and Forney—the only Native American employees on the study—recruited participants door-to-door in Pine Ridge.

Rebecca Andrews, the Clinical Research Manager for Rapid City, initially led the SYNCH study. She managed two part-time Research Assistants, Nick Palko and

-2-

Kylie Medler. She also worked on other projects, supervising over 20 employees in total. According to Tobacco, the Rapid City office had recruiting problems in 2022. As a result, Forney assisted in Rapid City. Tobacco claimed no one told her about Forney's new assignments, which frustrated her. Dr. Deutsch later directed Tobacco to join Forney in assisting with the SYNCH study in Rapid City. According to ARI, "[t]his was because there was not much left to do with the SYNCH project at the Pine Ridge location, and there was a lot more to be done in Rapid City."

That same year, Tobacco replaced Andrews as the lead on the SYNCH study. ARI called this a "better" redistribution of work across its different offices. The lead position did not change Tobacco's salary, benefits, or job description. According to Dr. Deutsch and Teresa Frederick—the Human Resources Officer—Tobacco was not the manager of the SYNCH study, but the "lead," with the responsibility for "scheduling the meetings, handling the meetings."

As lead, Tobacco prioritized participant recruitment. She directed Palko and Medler to conduct door-to-door recruitment in Rapid City. They expressed concern about their safety. Rapid City had experienced shootings, stabbings, and other forms of violence. Responding to their concerns, Tobacco invited Palko and Medler to join Forney and her in door-to-door recruitment in Pine Ridge. Tobacco also suggested that ARI provide self-defense training. Palko and Medler refused Tobacco's invitation and suggestion. They went to Andrews, their manager. Palko testified that Andrews told Medler and him to "take a pause on going door-to-door recruiting until she could figure out the safety concerns issue." According to Frederick in HR, Andrews remained Palko and Medler's manager.

According to Tobacco, Dr. Deutsch—the SYNCH principal investigator—told her she had authority to direct Palko and Medler to recruit door-to-door. Tobacco viewed Palko's and Medler's refusals as insubordination. Forney, the other Native American on the study, said that Palko and Medler "appeared [to be] afraid of interacting with the Native community." Forney told Tobacco that "he felt like ARI was treating them like 'token Indians' for the SYNCH project."

Andrews proposed an alternative video-recruitment method for Rapid City to her supervisor, Christine Hockett. Hockett supported the alternative, testifying that Palko's and Medler's safety concerns "had nothing to do with Native American communities," "or with [Tobacco] being the person managing or leading the study." This alternative eventually reached Dr. Deutsch.

On March 22, 2022, Tobacco and Dr. Deutsch, one-on-one, discussed "systemic race discrimination against Native people in Rapid City, weak efforts at DEI training, and their respective personal struggles with how to talk about race discrimination in the SYNCH team setting." They also discussed "discriminatory microaggressions." According to Tobacco, she shared her belief that generalized microaggressions and "discriminatory feelings" drove Palko's and Medler's refusals to recruit. She also told Dr. Deutsch she found the ARI workplace difficult, expressing concerns about "mak[ing] things worse" by speaking up about the microaggressions. Dr. Deutsch testified she interpreted Tobacco's statements about discrimination as limited to the context of the research at ARI. She believed Tobacco was discussing systemic racism, not discrimination against her at ARI. Dr. Deutsch did not report this discussion to HR.

According to Tobacco, her work environment grew only more chaotic and demeaning after this conversation. Tobacco stated that for months Palko and Medler continued to ignore her directives. Both Forney and she "were frustrated with the fact that Forney was having to drive to Rapid City to do Palko and Medler's work." Tobacco asked HR to explore disciplinary action against Palko and Medler. According to her, HR took no action for these complaints.

At a SYNCH team meeting, Tobacco confronted Palko and Medler about why they were not going into the Native American communities. They replied with their fears of violence. Tobacco testified she viewed their fears as discriminatory. Tobacco then asked Jyoti Angal (her supervisor) and Andrews (Palko and Medler's manager), "Why is it okay for me and [Forney] to go out in a dangerous community?" She told Dr. Deutsch, Angal, and Andrews that this difference in

-4-

treatment was "discriminatory" and "outright racist." According to Tobacco, they responded with silence.

At another SYNCH team meeting, Tobacco shared "she felt tokenized in the study." Palko testified that Medler and he reported Tobacco's statement to Andrews. Palko did not recall HR contacting him afterwards.

In April, Tobacco requested Frederick to mediate discussions between her and leadership—Dr. Elliott, Angal, and Hockett—because she felt racially discriminated against. This request stemmed from Angal instructing Tobacco to get a signature of an Oglala Sioux tribal leader to support a pending Health Resources and Services Administration grant, and to get anyone off the street to sign the support letter. According to Tobacco, when she shared she was unlikely to succeed, Angal threatened her with a reprimand. Tobacco claims she complained about racism and tokenism at the meeting. Frederick's meeting notes, however, did not mention these complaints. Instead, they reflected the discussion centered around: "the HRSA grant"; Tobacco's opposition to it; and, Tobacco's "confus[ion] on her involvement as a leader at Avera as well as on the Tribal Council IRB." Later asked if she recalled if the word "token" or "tokenized" was used in that meeting, Hockett testified, "No."

Dr. Deutsch eventually adopted the video-recruitment method for the SYNCH study at Rapid City. Dr. Deutsch had initially agreed with Tobacco's door-to-door recruitment method. After hearing the safety concerns, she "didn't agree with her anymore." She informed Tobacco about the change, and that Forney no longer had to drive to Rapid City. Tobacco viewed the change as diminishing her role as lead. On June 3, she emailed Dr. Deutsch, Angal, and Andrews about the "unfair distribution of labor" and the "strategic plan being ignored and unsupported by management." (capitalizations omitted). Angal forwarded this email to Dr. Elliott and Frederick. According to Tobacco, Frederick did not follow up on her complaints.

-5-

On June 9, Tobacco emailed Frederick, alleging that she was being retaliated against and faced resistance in her recruitment plan in the Rapid City office. On June 14, Tobacco and Frederick met. Tobacco complained about unfair workloads, dismissive conduct, and isolation in the SYNCH team. The two met again on June 22, where Frederick told Tobacco, "[B]ased on the information that was provided by [Tobacco] and her leadership . . . there has not been retaliation from the [Rapid City] Team or leadership."

Previously, on June 1, Avera's CEO mandated that department leaders improve their respective budgets by 5%, either by increasing revenue or reducing expenses. Dr. Elliott presented this mandate to the ARI administrative group on June 6. Dr. Elliott decided to reduce the budget by 5%.

The other two managers—Andrews and Christa Friedrich (for Sioux Falls)—attended ARI's administrative meetings. Tobacco did not. According to Tobacco, she did not know about the meetings and was never invited. Instead, after the meetings, she received information only from her supervisor, Angal. According to Tobacco, no one at ARI mentioned the 5% budget reduction to her.

To meet the required 5% budget improvement, Dr. Elliott decided to eliminate Tobacco's position as part of a reduction in force (RIF). On June 29, Dr. Elliott recommended Tobacco's termination to her supervisor and ARI's Vice President, Ryan Hansen. Dr. Elliott based her decision on the "limited grant dollars for one project at this location," adding, "There is only [one full-time employee] and we just don't need a manager at that site." Vice President Hansen approved this recommendation the same day.

Dr. Elliott admitted she did not know specifically how much money was needed to reduce ARI's budget by 5%. She did swear that Hansen determined that the RIF met the budget requirement. Dr. Elliott also admitted she did not review Avera's RIF POLICY (though testifying that HR had it, and that Frederick assisted her). Frederick told Dr. Elliott that she should follow the policy. Frederick also

testified she told Dr. Elliott "that if we were to reduce [Tobacco], severance would be offered," because Tobacco's "position and the location" rendered the transition services inapplicable.

On July 5, 2022, ARI terminated Tobacco. She asked Frederick if her termination was retaliation because of "their unhappiness with [her] that [she] refused to be tokenized." She also asked if it was discrimination based on her reporting racism. Frederick replied that her termination "was due to budgetary constraints." ARI offered her a 10-week severance package, adding that she could apply for open positions.

After exhausting her administrative remedies, Tobacco sued Avera. She alleged one count of race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and one count of race and national origin discrimination in violation of the South Dakota Human Relations Act, S.D.C.L. § 20–13–1 *et seq.* The same analysis applies to both counts. *See Axness v. Aqreva LLC*, 118 F. Supp. 3d 1144, 1157 (D.S.D. 2015); *Devericks v. John Morrell & Co.*, 297 N.W.2d 325, 327 (S.D. 1980).

Avera moved for summary judgment. The district court granted the motion, finding Tobacco failed to establish a prima facie case of race discrimination, and that she failed to show ARI's RIF was a pretext for discrimination. Tobacco appeals.

II.

This court reviews de novo a grant of summary judgment and will affirm when "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc), *quoting* **Fed. R. Civ. P. 56(c)(2)**. "To be material, a fact 'must affect the outcome of the suit under the governing law.'" *Id*. at 1052, *quoting* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine

-7-

issue for trial.'" *Id*. at 1042, *quoting **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U.S. 574, 586–87 (1986). Courts must view these genuine disputes of material facts most favorably to the nonmovant. *Id*. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*., *quoting **Ricci v. DeStefano***, 557 U.S. 557, 586 (2009).

III.

By Title VII, an employer may not "discharge any individual, or otherwise [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." **42 U.S.C. § 2000e-2(a)(1)**. "A plaintiff may defeat summary judgment by either offering direct evidence or creating an inference of unlawful discrimination." ***Schaffhauser v. United Parcel Serv., Inc.***, 794 F.3d 899, 902 (8th Cir. 2015).

Because Tobacco "did not provide direct evidence of unlawful discrimination," her claim is subject to the burden-shifting *McDonnell Douglas* framework. ***Macklin v. FMC Transp., Inc.***, 815 F.3d 425, 427 (8th Cir. 2016). To avoid summary judgment, Tobacco "must first establish a prima facie case of discrimination." ***Torgerson***, 643 F.3d at 1046. Establishing a prima facie case for race discrimination in the RIF context, Tobacco must show: (1) that she was within a protected group; (2) that she met applicable job qualifications; (3) that she was discharged; and, (4) some additional evidence that race was a factor in her termination. ***Herrero v. St. Louis Univ. Hosp.***, 109 F.3d 481, 483–84 (8th Cir. 1997). If she does, a rebuttable presumption of discrimination arises, and "the burden shifts to [ARI] to articulate a legitimate, non-discriminatory reason for its adverse employment action." ***Schaffhauser***, 794 F.3d at 903. If ARI provides a legitimate, non-discriminatory reason, then the presumption disappears, and "the ultimate burden [ ] falls on [Tobacco] to produce evidence sufficient to create a genuine issue of material fact" about whether the "proffered nondiscriminatory

-8-

justifications are mere pretext for intentional discrimination." **Torgerson**, 643 F.3d at 1046 (cleaned up).

## IV.

"Assuming, without deciding, that [Tobacco] presented a prima facie case of race . . . discrimination, [ARI] had the burden to articulate a non-discriminatory, legitimate justification for its conduct, which rebuts [her] prima facie case." **Bone v. G4S Youth Servs., LLC**, 686 F.3d 948, 954 (8th Cir. 2012) (quotation, internal citation, and italics omitted). *See* **Gibson v. Geithner**, 776 F.3d 536, 540 (8th Cir. 2015) (noting "the threshold of proof necessary to establish a *prima facie* case is minimal").

ARI consistently articulated "a legitimate, non-discriminatory reason" for terminating Tobacco: the need to improve the budget by 5%. *See* **Grant v. City of Blytheville**, 841 F.3d 767, 773 (8th Cir. 2016). Dr. Elliott reasoned that terminating Tobacco was the best way to do that. Most of the ARI's budget came from grants, meaning increasing the revenue by 5% was not feasible. Tobacco was one of the only employees at ARI whose salary was primarily funded by internal money. Tobacco also managed only one person at a location with few grant-dollars. For these reasons, ARI met its burden of showing a legitimate, non-discriminatory reason for terminating Tobacco. *See, e.g.*, **Schaffhauser**, 794 F.3d at 903 (noting an employer's burden of showing a legitimate reason "is not onerous"); **Rahlf v. Mo-Tech Corp.**, 642 F.3d 633, 638 (8th Cir. 2011) (recognizing a RIF as "a legitimate, nondiscriminatory justification" for layoffs); **Button v. Dakota, Minn. & E. R.R. Corp.**, 963 F.3d 824, 833 (8th Cir. 2020) (stating a company "need not provide evidence of financial distress to make" its RIF legitimate).

V.

Tobacco believes that the RIF was a pretext for discrimination. To prove pretext, Tobacco must prove that racial discrimination "was a determinative factor in [ARI]'s decision to terminate." ***Jones v. United Parcel Serv., Inc.***, 461 F.3d 982, 992 (8th Cir. 2006). *See **Torgerson***, 643 F.3d at 1046 (stating an employee's "burden to show pretext merges with the ultimate burden of persuading the court that" she was "the victim of intentional discrimination" (quotation omitted)). Tobacco can prove pretext by showing ARI's "explanation is unworthy of credence because it has no basis in fact," or "by persuading the court that a prohibited reason more likely motivated" ARI. ***Schaffhauser***, 794 F.3d at 904 (cleaned up). "Either route amounts to showing that a prohibited reason, rather than [ARI]'s stated reason, actually motivated [ARI]'s action." ***Torgerson***, 643 F.3d at 1047.

A.

Tobacco argues that Dr. Elliott's failure to follow Avera's RIF Policy shows that racial animus actually motivated the RIF.

The RIF Policy instructs its implementors to "provide the greatest possible job security for all of its employees," and that when a RIF is necessary, "every effort shall be made to provide the greatest possible assistance to the affected employee(s)." The policy states that the implementor should create a budget analysis with set targets, and that volunteers "will be sought to temporarily or permanently reduce hours." The policy then lists several criteria for evaluating employees for a RIF, including: seniority, past job performance, skill level, disciplinary action, and attendance. It adds that affected employees will be offered either human resources transition services, or severance.

The policy violations Tobacco identifies are that Dr. Elliott: failed to conduct a budget analysis before terminating her; failed to consult the selection criteria; failed to first ask for volunteers; chose severance over human resource transition

-10-

services; and, chose to reduce the budget rather than exercise the discretion in raising ARI's revenue.

"Although an employer's violation of its own policies may be indicative of pretext, that is not always so." *Schaffhauser*, 794 F.3d at 904. "An employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee as long as it does not unlawfully discriminate in doing so." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126–27 (8th Cir. 2017) (cleaned up).

Tobacco stresses that Dr. Elliott's failure to conduct a budget analysis before selecting her for termination "is strong evidence of pretext." Dr. Elliott admitted she neither knew the exact dollar amount needed to reach 5% nor approached the RIF "with a dollar amount in mind." She did, however, swear that Hansen "knew [she] was looking at the internal funding," and that he determined her proposal met the 5% requirement. Dr. Elliott's decision to focus solely on internal money without a cost-savings calculation may have been unsound. Employers, however, "are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008). "On this record, we do not believe that a reasonable jury could find that [ ] a causal connection exists," between Dr. Elliott's policy violations and Tobacco's race. *See Morris v. Dep't of Veterans Affs.*, 119 F.4th 536, 538 (8th Cir. 2024) (stating an employee claiming race discrimination must show a causal connection between the employer's failure to follow certain procedures and racial animus). *See also Schaffhauser*, 794 F.3d at 904 ("Even if the employer's acts are unfair, there has to be evidence connecting the unfairness to a discriminatory animus."); *Torgerson*, 643 F.3d at 1046 (stating the nonmovant retains "at all times, the ultimate burden of proof and persuasion" that the employer discriminated against her).

Tobacco's arguments about Dr. Elliott's failure to consult the selection criteria, ask for volunteers, or use her discretion to increase ARI's revenue similarly

fail. These were business decisions based on reducing internal money to meet budgetary constraints, and Dr. Elliott swore that Frederick assisted her with the RIF. Tobacco fails to connect these decisions to racial animus. *See Morris*, 119 F.4th at 538.

Tobacco emphasizes that ARI was actively hiring for at least three full-time positions during the RIF. These positions, however, were fully grant-funded, paying less, not at Pine Ridge, and Dr. Elliott and Frederick viewed them as demotions for her. While Tobacco may have been qualified for those positions, this court will not "second-guess [ARI's] business decision[]" to provide her severance instead of a demotion. *See Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014).

No reasonable jury could find that Dr. Elliott's policy violations or ARI's concurrent hiring demonstrate the RIF was mere pretext for discrimination.

B.

Tobacco argues that "racial tokenism" at ARI supports "a strong inference" that her race played a role in her termination. She swore that Dr. Elliott told her ARI hired her because she was Native American. While this is disputed, "a disputed fact alone will not defeat summary judgment." *Torgerson*, 643 F.3d at 1052. The (apparently) preferential hiring of Tobacco was neither discriminatory towards her nor material to whether racial animus more likely motivated her termination, and thus does not preclude summary judgment. *See Liberty Lobby*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

C.

Tobacco argues that ARI's "racialized environment" proves racial animus actually motivated ARI's RIF.

The incidents of racism at ARI that Tobacco identifies include: racism being discussed often at ARI; Dr. Deutsch's and Palko's acknowledgements of the discrimination against Native Americans participating in the SYNCH study; Angal's grant-signature demands; and, that in 2021, Dr. Elliott denied her request to lead another study, labeling her Native American heritage as a conflict of interest. Tobacco acknowledges that ARI's studies involved discussions of "systemic racism or community racism." But, Tobacco fails to explain how these discussions and acknowledgements were connected to her termination, particularly since the record shows neither Dr. Deutsch nor Palko had a role in the RIF decision. *See Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008) (finding no pretext where persons who demonstrated a discriminatory motive were not those responsible for termination). Similarly, Tobacco fails to show evidence that Angal was involved in her termination. *See id*. For Dr. Elliott's conflict-of-interest determination, Tobacco again fails to connect it to her termination. *See Yates v. Douglas*, 255 F.3d 546, 549 (8th Cir. 2001) (finding no pretext where the decision-maker's racist comments were "approximately one to two years prior" to the plaintiff's termination, and the plaintiff failed to "establish a causal link between the comments and his termination"); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 923 (8th Cir. 2000) (stray remarks can "constitute circumstantial evidence" *if* "considered together with other evidence" they give rise to a reasonable inference of discrimination). No reasonable jury could find these incidents motivated ARI's termination of Tobacco. *See Jones*, 461 F.3d at 992 (stating "more substantial evidence of discrimination is required to prove pretext" than to establish a prima facie case, "because evidence of pretext is viewed in the light of [the employer]'s legitimate, non-discriminatory explanation").

Tobacco argues that Forney and she were treated differently than Andrews, Palko, and Medler on the SYNCH study because they were Native American.

"While instances of disparate treatment can support a claim of pretext," Tobacco must prove that Forney and she and the non-Native American employees were "similarly situated in all relevant respects—a rigorous standard at the pretext stage." *Torgerson*, 643 F.3d at 1051 (quotation omitted). Tobacco cannot meet this

-13-

rigorous standard. Palko and Medler were part-time Research Assistants, while Tobacco and Forney were full-time, with Tobacco being a Clinical Research Manager and study lead. While Andrews was also a Clinical Research Manager and a lead for the SYNCH study, she had a different supervisor, supervised more employees, managed a different office, was involved in projects with future grant-funding, and had a salary primarily grant-funded. Tobacco cannot show Forney and she were similarly situated in all relevant respects with Andrews, Palko, and Medler. *See id*.; *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019) ("[T]he plaintiff and the potential comparators must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without any mitigating or distinguishing circumstances." (quotation omitted)).

Importantly, Tobacco cannot show disparate treatment. Neither Forney nor she complained about their safety when recruiting. Instead, they chose to continue recruiting door-to-door in the face of rising violence in Rapid City. This is not evidence of discrimination. Tobacco provides no evidence showing race motivated Palko's, Medler's, Andrews's, or Dr. Deutsch's actions, or inactions, for the SYNCH study. No reasonable jury could find that ARI's shift away from door-to-door recruitment in Rapid City shows racial animus more likely motivated the RIF. *See Musolf v. J.C. Penney Co.*, 773 F.3d 916, 918 (8th Cir. 2014) ("The non-moving party must substantiate her allegations by sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy." (cleaned up)).

Tobacco asserts her exclusion from managerial meetings shows disparate treatment, supporting her claim of pretext. Tobacco compares herself to Andrews and Friedrich, who were invited to the meetings. As discussed, Tobacco and Andrews are not similarly situated in all relevant respects. *See Torgerson*, 643 F.3d at 1051. The same holds true for Tobacco and Friedrich. While Friedrich was also a Clinical Research Manager, she managed the Sioux Falls office, and her salary was primarily grant-funded. Tobacco cannot show she was similarly situated in all relevant respects with these managers. *See id*.

-14-

Regardless, Tobacco's evidence of disparate treatment from her exclusion from the meetings cannot support her claim of pretext. Tobacco fails to show any evidence that Andrews or Friedrich were involved in Dr. Elliott's decision to terminate her in the RIF. No reasonable jury could find that Tobacco's exclusion from the meetings shows racial animus more likely motivated the RIF. **Green v. Franklin Nat'l Bank of Minneapolis**, 459 F.3d 903, 913 (8th Cir. 2006) ("A plaintiff must show some causal link between the differential treatment and her adverse employment action.").

## D.

Tobacco argues that ARI failed to follow Avera's "discrimination policies." Avera's "Harassment-Free Work Environment" Policy states it "encourages reporting of all perceived incidents of discrimination or harassment," and that employees should "promptly and thoroughly investigate such reports." Tobacco identifies the following violations: that Frederick did not legitimately investigate her complaints about Palko and Medler, the unfair distribution of labor, or discrimination; that Andrews did not relay Palko and Medler's report about Tobacco's tokenization comment to HR; and, that Dr. Deutsch failed to report her complaints about discrimination. Tobacco concludes that these policy violations support an inference that ARI's RIF was a pretext for discrimination.

Tobacco's argument fails. Tobacco does not show a causal connection between these alleged violations and Dr. Elliott's decision to terminate her. *See Morris*, 119 F.4th at 538. *Cf.* ***Lake v. Yellow Transp., Inc.***, 596 F.3d 871, 876 (8th Cir. 2010) (finding summary judgment inappropriate where the employee raised material factual disputes about the employer's proffered reason for his termination, and about whether the employer applied its relevant policies equally). No reasonable jury could find that these alleged violations show racial animus more likely motivated the RIF.

E.

Tobacco argues that Dr. Elliott's knowledge "about [her] June 2022 discrimination and retaliation complaints," and Dr. Elliott's discussions with Hansen about them show that the RIF was a pretext for discrimination. Tobacco asserts only that there was no "legitimate reason why Elliott and her supervisor would have been talking about [her] discrimination complaint—as it was not being actively investigated." First, Tobacco did not raise a retaliation claim. *See* **42 U.S.C. § 2000e-3(a)**. Second, Dr. Elliott's knowledge of Tobacco's discrimination complaints and her discussion with Hansen do not show that ARI's RIF was mere pretext for discrimination. *See **Jackson v. United Parcel Serv., Inc.***, 643 F.3d 1081, 1088 (8th Cir. 2011) ("A party's unsupported self-serving allegation that her employer's decision was based on retaliation does not establish a genuine issue of material fact." (cleaned up)). *Cf. **Carter v. Kan. City S. Ry. Co.***, 456 F.3d 841, 849 (8th Cir. 2006) ("[A]ctions by management that show a hostility to complaints of racial harassment even when the plaintiff was not aware of those actions can create an inference sufficient to establish intentional discrimination.").

F.

Tobacco argues that the timing between her discrimination complaints and her termination—about three months after her meeting with Dr. Deutsch, about two months after her mediation with leadership, nearly a month after her email to and initial meeting with Frederick, and nearly two weeks after her final meeting with Frederick—entitles her to an inference that racial animus more likely motivated the RIF. Again, Tobacco never raised a retaliation claim. Even if she had, "proximity alone is insufficient to establish pretext." ***Gibson***, 776 F.3d at 541. *Cf. **Huber v. Westar Foods, Inc.***, 139 F.4th 615, 625 (8th Cir. 2025) (en banc) ("[C]lose timing can rarely show pretext on its own."). The timing here is insufficient to prove pretext. *See **Jones***, 461 F.3d at 992 ("[E]vidence of pretext is viewed in the light of [the employer]'s legitimate, non-discriminatory explanation.").

-16-

## G.

Tobacco believes that Dr. Elliott's decision to terminate only her in the RIF (with no cost-savings calculation) shows it was a "sham." But, Tobacco was one of the only employees at ARI whose salary was primarily funded by internal money. She does not identify another ARI employee whose salary was primarily funded with internal money. The record also shows: ARI was mostly grant-funded; Tobacco managed only one person at a location funded with only a few grants; and, few (or no) future grants were scheduled for that location.

## VI.

Nothing in all the facts here shows that the RIF was more likely motivated by race than by its proffered justification—responding to budgetary constraints. Tobacco thus fails the final stage of the *McDonnell Douglas* framework. *Cf.* **Reeves v. Sanderson Plumbing Prods., Inc.**, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). The district court properly granted summary judgment to Avera.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____